IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUELINE L. MADISON,       )
                             )
          Plaintiff,         )
                             )
     v.                      )     No. 09 C 3629
                             )
CITY OF CHICAGO,             )
                             )
          Defendant.         )

MEMORANDUM OPINION AND ORDER

Jacqueline Madison ("Madison") has charged her former employer, the City of Chicago ("City"), with discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§2000e to 2000e-17). City has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and the motion has been fully briefed. For the reasons stated here, the motion is granted and this action is dismissed.

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).[1] For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor

---

[1] At the summary judgment stage, of course, Madison need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion employs the quoted terms only because the cited cases use that terminology, but it imposes on Madison the lesser burden described earlier in this footnote.

(Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.).

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).[2] What follows is a summary of the facts,[3] viewed of course in the

---

[2] Madison Mem. 3 seeks to call to her aid the opinion in Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1111 (9th Cir. 1991), which holds that summary judgment should normally be denied "[e]ven if the defendant articulates a legitimate, nondiscriminatory reason for the challenged employment decision," because "when a plaintiff has established a prima facie inference of disparate treatment through direct or circumstantial evidence of discriminatory intent, he will necessarily have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision" (id., emphasis in original). But in light of Seventh Circuit law as firmly established in such cases as Greene v. Potter, 557 F.3d 765, 769 (7th Cir. 2009), this Court of course declines to adopt the Ninth Circuit's view.

[3] This District Court's LR 56.1, adopted to implement Rule 56, requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Madison's LR 56.1 statement as "M. St. ¶ --," to City's LR 56.1 statement as "C. St. ¶ --" and to the parties' responses as "M. Resp. ¶ --" and "C. Resp. ¶ --." Where a party's response does not provide a different version of the facts than the original statement, this opinion cites only that original statement.

2

light most favorable to nonmovant Madison.[4]

**Factual Background**

Madison is an African-American woman who worked for City's Department of Transportation ("CDOT") as a Coordinator of Special Projects from June 2000 until her termination on December 31, 2008 (C. St. ¶1). In 2003 or 2004 Madison accepted an invitation from Gilberto Quinones ("Quinones") to work for him in the Accounts Payable group of CDOT's Finance Section (id. ¶9). In 2004 Quinones was promoted to Deputy Commissioner and James Bracewell ("Bracewell") was assigned to head the Contracts Section (id. ¶10). When Bracewell left his position, Lou Langone ("Langone") replaced him (id. ¶11).

Madison's problems with City began in 2006. Sometime in the summer of that year Quinones "hit on" Madison (C. St. ¶47). Madison believes the incident was race-related because "it was common knowledge that [Quinones] loved black women" (id.). In October of the same year Quinones yelled at Madison, in a meeting that included seven or eight other City employees, for something Madison believed was outside of her control (C. St. ¶48; M. St.

---

[4] City contends that Madison's affidavit and other factual submissions should be stricken because they contain inadmissible evidence in violation of Rule 56(e)(1). While this Court is certainly under "no obligation to scour [Madison's] affidavit in order to glean what little admissible evidence it may have contained" (Rogers v. City of Chi.,320 F.3d 748, 751 (7th Cir. 2003)), Madison's affidavit and other submissions include enough admissible evidence to preclude such a death warrant.

3

¶26).[5]  Also in the fall of 2006, Madison agreed to work for the O'Hare Modernization Program ("OMP")(C. St. ¶13) and did so for a few months before returning to CDOT's Contracts Section (C. St. ¶14).  Madison received a positive work evaluation in 2006 (M. St. ¶38).

Madison's problems continued in 2007.  During the course of the year Madison was counseled by Bracewell for tardiness on three separate occasions (C. St. ¶40).[6]  On another occasion in early April, Madison engaged in a verbal altercation in the office with Kesha Thompson ("Thompson"), a consultant to CDOT (C. St. ¶18).  After Thompson filed a Workplace Incident Report against Madison with CDOT's Human Resources Section, Assistant Commissioner Tom Carney ("Carney") of that Section conducted an investigation into Thompson's complaint (C. St. ¶19).

In a written statement to Carney, Madison wrote that in the aftermath of the incident she told a co-worker she "wasn't about to lose [her] job over [Thompson], if anything I'll follow [Thompson] home and jump on her in front of her mother" (C. St. Ex. F).  Madison noted in the same written statement that "[w]e

---

[5] Madison called acting Commissioner Heramb ("Heramb") to complain about Quinones' conduct, but she did not pursue the complaint after Heramb asked her to "let it go" (M. St. ¶27).

[6] Madison had train delay slips to explain her tardiness each time (M. Resp. ¶40).  Once, after reviewing Madison's train delay slip, Bracewell said, "don't worry about it...but I was told to counsel you" (M. Dep. 28).

4

all laughed because everyone knew it was a joke" (id.). Carney concluded in a June 18 memorandum that Madison had violated Rule XVIII §1 ¶¶50 and 54 ("conduct unbecoming an officer or public employee" and "violence in the workplace")(id. ¶21).[7] After refusing to apologize at a pre-disciplinary meeting with Quinones and Langone, Madison was suspended for five days (id. ¶25).[8] Sometime in 2007, when Madison was leaving Quinones' office, he called her "a bitch" under his breath (id. ¶60). On July 25, 2007 Madison filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC")(id. ¶37).

On November 16, 2008 Madison spoke to Quinones about a personal day request she had recently placed with Langone for the day after Thanksgiving (C. St. ¶25). Quinones told Madison that Langone had to make sure that his section was fully staffed on that date before granting the personal day (id.). Madison responded by raising her voice, telling Quinones that she would have a doctor's appointment that day and leaving Quinones' office (id. ¶26). Quinones wrote a memorandum to Madison

---

[7] Carney determined that Madison's conduct violated Personnel Rules because she "initiated a heated verbal altercation, made direct and indirect threats of a threatening and intimidating nature, and made other hostile remarks" (C. St. ¶21).

[8] Madison complained to Commissioner Heramb about the suspension and received the response that it would be in her best interest not to bring the complaint to the City's Office of Compliance because further investigation into the altercation could result in Madison losing her job (M. St. ¶12).

5

admonishing her for the outburst and the threatened misuse of sick leave (id. ¶27).

In March 2008 Madison accepted an offer from Eric McMiller ("McMiller"), Director of Administrative Services, to work for him in CDOT's Finance Section (C. St. ¶15). In response to Langone accusing Madison of taking unauthorized breaks in early August, Madison wrote a letter to Carney complaining of false charges that singled her out (M. St. ¶¶30-31).

Also in August 2008, Carney set up an appointment for Madison with a human resource clinical therapist to address McMiller's claim that Madison had approached him in a threatening manner (M. Dep. 169-70). On September 9 McMiller asked Madison to come into his office, and she asked whether a third person could accompany her (C. St. ¶30; M. Resp. ¶30). After a pre-disciplinary meeting was then held to discuss a recent series of events between McMiller and Madison (C. St. ¶31), on September 13 Madison received a notice advising her that she was being docked one day's pay for violating Personnel Rule XVIII §1 ¶¶25 and 50 ("insubordinate actions" and "conduct unbecoming an officer of public employee")(id. ¶32). On September 30, 2008 Madison filed a Charge of Discrimination with EEOC (id. ¶38).

That same year marked a city-wide budgetary reduction in force ("RIF") to take effect on December 31, 2008 (C. St. ¶33). First Deputy Commissioner Thomas Powers worked with Manager of

6

Finance James Crocker and Carney to prepare a recommendation to CDOT Commissioner Thomas Byrne as to how the agency could best meet the RIF-required spending and personnel cuts (id. ¶34). That recommendation included the names of employees that the group believed would have the least impact on CDOT's operations (C. St. ¶35). Madison received her notice of inclusion in the RIF on December 23, 2008 (C. St. ¶16),[9] and she was terminated as part of the RIF on December 31, 2008 (id. ¶1).

## Employment Discrimination under Title VII

To survive a summary judgment motion, Madison must establish a genuine issue of material fact as to whether City engaged in intentional discrimination. Two routes may be taken to that end: (1) the direct approach, under which a plaintiff adduces direct evidence of the employer's discriminatory intent or creates a "convincing mosaic of discrimination" out of pieces of circumstantial evidence (Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 2004)), or (2) the indirect approach, which employs the sequential burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

But before this Court turns to an examination of Madison's claims in terms of those alternatives, this opinion will look at

---

[9] Madison went to McMiller in response to the notice and asked him to speak with the Commissioner on her behalf (M. St. ¶6; C. Resp. ¶6). McMiller refused because "the suspension came along during a time that [they] were doing the budget, and then you have the thing with Lou Langone"(M. St. ¶6).

7

the existence and scope of an essential ingredient of each: a showing that Madison suffered one or more of the types of impact categorized in Lewis v. City of Chi., 496 F.3d 645, 653 (7th Cir. 2007):

> (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions....

As for the first of those categories, City admits (as it must) that Madison's termination and her earlier five day suspension constituted adverse employment actions. But Madison is less successful in seeking to characterize other events during her tenure as fitting into the second and third categories and hence as also constituting adverse employment actions (M. Mem. 8).

In an effort to bring herself within the second Lewis-identified category, Madison points out that she was counseled three times for supposed tardiness and was transferred to OMP (M. Mem. 8). But as to the first of those, it cannot seriously be contended that being counseled three times for tardiness involved a "tangible employment action"--that is, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits" (Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Nor can

8

Madison's short term transfer to OMP (especially when followed by a favorable work evaluation) be labeled as a material adverse employment action. Indeed, Madison admits she did not complain about the transfer before, during or after it took place (C. St. ¶¶54-55). Further, that short term lateral transfer would not be an adverse action because Madison faced no loss in pay or other benefits (<u>Washington v. Ill. Dep't of Revenue</u>, 420 F.3d 658, 661 (7th Cir. 2005)).

As for the third <u>Lewis</u> category, which includes changes in work conditions, the <u>Factual Background</u> section has spoken of Madison's complaints of having been (1) called a "bitch" by a supervisor, (2) yelled at by another supervisor, (3) initially denied a personal day to which she believed she was entitled, (4) threatened with a 15 day suspension, (5) sent to a City psychiatrist and (6) told she was "being watched" (M. Mem. 8). Even when taken collectively, those grievances do not constitute adverse employment actions. They contrast markedly with potentially actionable changes in working conditions such as "mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially [her] conditions of employment as they would be perceived by a reasonable person in the position" (<u>Herrnreiter v. Chi. Hous. Auth.</u>, 315 F.3d 742, 745 (7th Cir. 2002)).

Because that third category grows out of the hostile work

9

environment context, it sets a high bar for establishing an adverse employment action (see, e.g., Hilt-Dyson v. City of Chi., 282 F.3d 456, 463 (7th Cir. 2002), quoting from Farragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)("Moreover, a hostile work environment is one that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so.' In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors may be considered including 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'")). What Madison has cobbled together was neither serious enough nor frequent enough to create, or even to approach, such a hostile workplace environment.

In summary, then, it is only Madison's termination and her earlier five day suspension that qualify as adverse employment actions. They constitute the adverse consequences that must be shown to have been motivated by claimed discrimination on City's part. It is against that backdrop that the earlier-mentioned alternative routes of showing discrimination are explored next.

**Direct Approach**

Madison seeks to advance, if thinly,[10] the direct approach to proving discrimination. Because there is no direct evidence of City's discriminatory animus, Madison can adduce only circumstantial evidence[11] to suggest discrimination. In that respect she contends that similarly situated non-protected employees were treated more favorably than she was.

Courts look at "all relevant factors" in determining whether employees are similarly situated (Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000)). Those factors most typically include whether the employees shared the same supervisor and performance standards and whether they engaged in similar conduct (Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't, 510 F.3d 681, 688 (7th Cir. 2007)). Such factors, however, "should not be applied mechanically or inflexibly" (Hull v. Stoughton Trailers, LLC, 445 F.3d 949, 952 (7th Cir. 2006)).

---

[10] Madison's memorandum sets out the legal basis for a direct approach to proving discrimination but makes no effort to apply it to the facts here (M. Mem. 4). This Court is "not required to scour [Madison's] various submissions to piece together appropriate arguments" (Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995)). Madison skates on thin ice with such spotty legal analysis in combination with her earlier-discussed questionable factual submissions.

[11] Such circumstantial evidence may include for example suspicious timing, ambiguous statements that can be read as discriminatory, preferential behavior toward other employees, evidence that similarly situated non-protected employees were treated more favorably or evidence of pretext (Troupe, 20 F.3d at 736-37).

Madison identifies four possible comparators: Madeline O'Casio ("O'Casio"), Joanne Boumenot ("Boumenot"), Margaret (last name unknown) ("Margaret") and Carol Crissie ("Crissie"). Madison posits that Boumenot, O'Casio and Margaret routinely came to work late in violation of City's attendance policy (C. St. ¶46), but she draws solely on her own workplace observations in asserting that they suffered no discipline for their tardiness (id.). What that means is that she <u>observed</u> no counseling such as that she received. But such counseling is of course a private process, so that Madison's speculation on that score does not create a genuine issue of material fact. Further, Madison never shared a supervisor with Boumenot, and she shared a supervisor with O'Casio and Margaret only briefly (id.). So that facet of Madison's asserted comparator argument fails.

Madison also argues that Crissie and Boumenot were treated more favorably than she when each engaged in verbal altercations in the workplace. Madison heard Boumenot call a manager a "bitch" (C. St. ¶57; M. Resp. ¶57). Madison never saw Boumenot miss work,[12] and she believes that the only discipline Boumenot received was a one day counseling session (C. St. ¶58). As for

---

[12] This opinion credits Madison's assertion that because she shared a floor with both Crissie and Boumenot she would have been aware if they were suspended. That inference is a poor substitute for what could have been established definitively by personnel records, but neither party has seen fit to include such records in its or her submissions.

12

Crissie, Madison also observed her yelling at a supervisor (id.).

Those incidents fail the "similarly situated" employee inquiry. First, the conduct at issue as to the other two employees was not similar to Madison's altercation with a co-worker that gave rise to Madison's five day suspension, as to which she was found to have violated numerous Personnel Rules, including those relating to violence in the workplace (C. St. ¶21). No such determination was made in Crissie's or Boumenot's cases, nor does it appear that any was warranted--there was no evidence of threats of physical violence.

Further, Madison admits that she and Boumenot never shared the same supervisor (id. ¶46), and there is no evidence to suggest that Crissie shared the same supervisor with Madison either. In sum, even under a generous similarly-situated-employee analysis, Madison has not identified a plausible comparator to establish the circumstantial evidence she would need to prove direct discrimination at trial.

**Indirect Approach**

Nor does Madison fare any better under the indirect approach to establishing discrimination. To that end she must follow the McDonnell Douglas path that begins with the oft-repeated four factor prima facie case as reconfirmed in such cases as Gusewelle v. City of Wood River, 374 F.3d 569, 574 (7th Cir. 2004)(adapted to a female plaintiff):

> To do this, a plaintiff must show: (1)[s]he is a member
> of a protected class; (2)[s]he was qualified for the
> position; (3)[s]he suffered an adverse employment
> action; and (4) a similarly situated employee not of
> the protected class was treated more favorably.

If Madison meets that test, City must proffer a legitimate nondiscriminatory reason for its conduct (id.; McDonnell Douglas, 411 U.S. at 802). And once that is done, Madison must establish that the reason was a pretext for discrimination (id. at 804).

As an African-American, Madison of course satisfies the first prima facie element. And there is no need to dance the intermediate steps in the McDonnell-Douglas quadrille, for its shifts in the burdens of production always leave Madison with the burden of persuasion.[13] Hence this opinion moves directly to the issue of pretext, an approach amply supported by the caselaw (see, e.g., Olsen v. Marshall & Isley Corp., 267 F.3d 597, 600-01 (7th Cir. 2001)).

In that respect our Court of Appeals has consistently framed the issue in terms of the employer's honesty. That message has been delivered via a number of different locutions (see, e.g., Burks v. Wis. Dep't of Transp., 464 F.3d 744, 754 (7th Cir. 2006)(internal quotation marks and brackets omitted)("In order to be pretextual the proffered reasons must be a lie; we look to

---

[13] As n.1 reflects, the "burden of persuasion" in opposition to a Rule 56 motion requires only the demonstration of a genuine issue of material fact.

whether the employer's reasons for its decision are honest and genuinely motivated. We are not concerned with whether or not the employer's actions were mistaken, ill considered or foolish, so long as the employer honestly believed those reasons") and Forrester v. Rauland-Borg Corp., 453 F.3d 416, 419 (7th Cir. 2006)(internal citations and quotation marks omitted)("A pretext, to repeat, is a deliberate falsehood. An honest mistake, however dumb, is not, and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage. The only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs")).

As for Madison's five day suspension, City cites her violations of its Personnel Rules and the findings in Carney's report (C. Mem. 7). Madison provides no evidence or analysis that even suggests labeling City's action as pretextual--as dishonestly imposed.

Madison fares no better as to the ultimate adverse action--her termination--which City ascribes to the citywide RIF (C. Mem. 7). On that score City says Madison was terminated because her main program responsibility, the Shared Sidewalk Program, was substantially reduced in the RIF. Although Madison argues that her responsibilities for the Shared Sidewalk Program

15

accounted for just one-third of her work,[14] City's nondiscriminatory motivation is strongly supported by its decision to terminate each of the three other employees responsible for the same program (C. St. ¶35).

Essentially Madison's claim of pretext boils down to a hypothesis that one-third of her time could have been filled with other work. Even apart from the failure of that theory to account for the clearly nondiscriminatory simultaneous termination of the other employees, it amounts to questioning City's business judgment as to how best to implement a reduction strategy intended to have the least impact possible on existing City operations. That is not the role of the federal courts in these cases (see, e.g., Ritter v. Hill 'N Dale Farm, Inc., 231 F.3d 1039, 1044 (7th Cir. 2000)). In short, Madison flat-out flunks her effort to charge City with race-based discrimination.

## Retaliation

Although Madison has struck out on the summary judgment standard as applied to her employment discrimination claim, she can still survive summary judgment if she is able to show that City retaliated against her for filing a charge of employment discrimination with EEOC. Kampmier v. Emeritus Corp., 472 F.3d

---

[14] Madison also asserts that non-African-Americans were later hired to take over her job (M. St. ¶¶7-9; C. Resp. ¶¶7-9), but she offers nothing other than inadmissible hearsay on that score. Rule 56(e) requires that suggestion to be disregarded.

16

930, 939 (7th Cir. 2007)(citation omitted) has summarized the basics of retaliation claims:[15]

> Under Title VII, unlawful retaliation occurs when an employer takes actions that "discriminate against" an employee because she has opposed a practice that Title VII forbids....A plaintiff has two means of proving Title VII retaliation: the direct method and the indirect method.

And Humphries v. CBOCS West, Inc., 474 F.3d 387, 404 (7th Cir. 2007)(citations and internal quotation marks omitted) has elaborated on that second sentence::

> Under the direct method, [plaintiff] must present direct evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. Under the indirect method, he must show that after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner. Thus, the indirect method of establishing a prima facie case requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily.

Here Madison appears to follow only the first method.[16] And to demonstrate the necessary causal connection between the

---

[15] Madison characterizes her claim as "a hostile work environment of retaliation" claim (M. Mem. 14). That seems to be a garbled version of a conventional claim for retaliation, but one in which the supposed discriminatory actions are those that Madison argues constitute a hostile work environment.

[16] Madison's memorandum is unclear as to whether she wishes to pursue the indirect method of proof (M. Mem. 13). But simply measuring the analysis in the prior section of this opinion against the Humphries-identified yardstick shows conclusively that any such effort would have been a sure loser.

17

adverse action and the protected activity, "plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions" (<u>Sauzek v. Exxon Coal USA, Inc.</u>, 202 F.3d 913, 918 (7th Cir. 2000)).

Madison complains of a series of purportedly adverse actions taken after she had filed two separate EEOC complaints. But once again the only actions that can properly be considered are the five day suspension and the termination. Indeed, even if that were not the case, Madison cannot rationally posit a causal nexus between the filing of her EEOC charges and any of City's actions.

It takes only a moment's thought to see that is so as to Madison's July 2007 filing of an EEOC charge. And as for her contention that her December 31, 2008 termination was in retaliation for her having filed a second racial discrimination charge with EEOC on September 30, 2008 (<u>id</u>. 15), she can offer up nothing other than the "chronology of events" (M. Mem. 13).

In that respect <u>Sauzek</u>, 202 F.3d at 918 (citations omitted) exemplifies the caselaw that uniformly teaches the poverty of such efforts:

> Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions. The mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another.

18

In this instance even a potential inference that might be drawn from the timing is torpedoed by the parallel treatment--termination--that City gave to non-African-Americans on the previously targeted December 31, 2008 RIF date (see Stone v. City of Indianapolis Pub. Utile. Div., 281 F.3d 640, 644 (7th Cir. 2002)). Madison's retaliation claim is a loser as well.

**Conclusion**

With no genuine issue of material fact having been identified, City is entitled to judgment as a matter of law on all of Madison's claims. City's Rule 56 motion is granted, and this action is dismissed with prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date: October 14, 2010